**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LINDA LEATHER, WILLIAM KING,** ) | |
| **ANTHONY GUGLIUZZA,** and ) | |
| **STEPHEN DARDZINSKI**, on behalf ) | Judge:_____ |
| of themselves ) | |
| and on behalf of a class of others similarly ) | |
| situated, ) | |
| ) | |
| Plaintiffs, ) | Docket No.: 1:18-cv-2267 |
| ) | |
| v. ) | |
| ) | **Jury trial requested** |
| **THE UNITED STATES OF AMERICA** ) | |
| ) | |
| Defendant. ) | |

**CLASS ACTION COMPLAINT**

Plaintiffs, individually and on behalf of a class of others similarly situated, allege as follows:

**INTRODUCTION**

1. Plaintiffs are retired workers. Until December 2014, federal law expressly protected their monthly pension payments from being reduced. Plaintiffs earned those pension payments by working for private employers. Until and unless a pension fund ran out of money, a retiree's monthly payment could not be altered. Recipients had an ironclad legal right to receive monthly payments in an identical, predictable amount until they died or, if the fund ran out of money, to receive reduced payments from a government insurance plan. This is a case about whether the federal government may authorize a pension fund that manages approximately one billion dollars to cut vested pensions, as it wishes, even when a supermajority of voting

1

plan participants oppose the cuts and even when the cuts are far harsher to retired workers than to active workers even though the statute requires fair treatment of all plan participants.

2. This Complaint maintains that the government action was unlawful—that it must be voided, that compensation must be paid for the illegal seizure, and that a declaratory judgment should issue that the government must rescind its authorization of pension plan to withhold payments that plaintiffs earned during their working years and to which they are entitled.

3. In the alternative, this Complaint seeks to establish that the government, by authorizing those cuts, engaged in an uncompensated taking of the Plaintiffs' property—their money. Put differently, even if the law upon which the government acted was legal, Plaintiffs have a right to fair compensation. One Plaintiff, on behalf of a Damages Class, seek damages. All four Plaintiffs, on behalf of themselves and a proposed injunctive class, seek equitable remedies.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1346. All monetary claims in this case are capped at $10,000 per plaintiff. A separate lawsuit has been filed in the Court of Federal Claims for certain plaintiffs with monetary damages above $10,000. *See King et al. v. United States*, Case No.: 1:18—cv—01115—NBF.

5. The Court may enter declaratory relief under 28 U.S.C. § 2201.

6. The Court has jurisdiction under 28 U.S.C. § 1343(a)(1) to enter injunctive relief, to order restitution, and to secure any other equitable relief to which Plaintiffs are entitled.

7. This Court is an appropriate venue under 28 U.S.C. § 1402(b) because the government actions on which this Complaint rests occurred largely or entirely within this judicial district and, more generally, under 28 U.S.C. § 1391.

## PARTIES

8.  Plaintiff Linda Leather resides at 12 Pleasant Street, Auburn, NY 13021.

9.  Plaintiff William "Bill" King resides at 5870 Valley Drive, Jordan, NY 13080.

10. Plaintiff Anthony "Tony" Gugliuzza resides at 8163 Adamello Circle, Clay, NY 13041.

11. Plaintiff Stephen "Steve" Dardzinski resides at 1 Hillsborough Street, Fairport, NY, 14450.

12. Defendant is the United States of America.

## RELATED CASES

13. This case is not, to the best of Plaintiffs' and counsel's knowledge, related to any case
    previously filed in this Court. It is, however, related to a case filed in the U.S. Court of
    Federal Claims on July 31, 2018. *See King et al. v. United States*, Case No.: 1:18—cv—
    01115—NBF. Congress has afforded this Court and that Court jurisdiction over some, but
    not all, of the plaintiffs' claims. This Court may grant injunctive relief. The Court of Federal
    Claims may not. This Court may hear only claims under $10,000; the Court of Federal
    Claims has jurisdiction over claims above that amount. This Court may hear arguments that
    the government's authorization of a private party to keep plaintiffs' property is *ultra vires*.
    The Court of Federal Claims may only hear claims based on the premise that the government
    executed a lawful taking of property—but that it failed to pay fair compensation. The claims
    in this lawsuit and the one pending in the Court of Federal Claims are closely related, but
    neither can nor do involve duplicative claims.

## STATEMENT OF THE CLAIM

14. In 1954, a collective bargaining agreement established a pension fund called the New York
    State Teamsters Conference Pension & Retirement Fund (the "Fund"). The Fund has
    operated continuously since that time.

15. The Fund is a multiemployer plan, meaning that a number of companies contribute into a single fund. Like other multiemployer plans, the Fund pays retirement benefits to people who worked at one or more participating companies. This multiemployer approach was established by Congress to reduce the risk that retirees from a given company would lose their pensions if one or more of their employers became insolvent.

16. Some multiemployer plans are struggling to meet their future pension obligations. Plaintiffs bear no fault for those struggles.

17. In December 2014, Congress enacted the Kline-Miller Multiemployer Pension Reform Act of 2014 ("Kline-Miller" or "MPRA").

18. MPRA reflected Congress's concern that a governmental insurance program called the Pension Benefit Guaranty Corporation would face harm unless vested pension benefits were cut. For instance, in promoting the bill on Capitol Hill, sponsors in the House of Representatives warned that "the failure of these plans *will bankrupt the Pension Benefit Guarantee* [sic] *Corporation* (PBGC), which serves as the federal backstop charged with protecting these workers' pensions." (emphasis added). The officials throughout the executive branch who implemented regulations for MPRA knew and discussed with one another the well-known reality that the statute aimed primarily to protect PBGC, not retirees or active workers.

19. The law was designed, at least in significant part, to lower the government's insurance costs and to prop up this insurance program, the PBGC. If the PBGC became insolvent, it would have paid hundreds of millions of dollars in claims and the defendant would face crushing political pressure to underwrite any losses beyond the amount that the PBGC could cover. Notably, multiemployer pension plans are required by federal law to pay insurance premiums

4

to the PBGC in order to purchase insurance from the PBGC for retirees' pensions. The PBGC pays retirees whose pension plans cannot meet the plans' financial obligations in amounts greater than certain minimum agreed-upon levels. The government is acting as a market participant by insuring these pensions.

20. The government also shifted hundreds of millions of dollars in wealth from plaintiffs, who have no representation on the Fund's board, to active workers who have significant representation on the Fund's board. The government thereby authorized and enabled the Plan to divert specific money from plaintiffs to other individuals.

21. MPRA provides a mechanism under which the trustees of multiemployer pension plans may obtain the government's approval to cut vested, accrued pension benefits—money that Plaintiffs have earned and that is sitting in a trust account for their benefit. This action is akin to allowing trustees of a family trust to reduce how much money they pay each month to the settlor's *children* each month, in violation of the plain terms of the trust, to increase the amount that goes to the *grandkids*. It is also akin to allowing an insurance company cut annuity payments to people currently receiving payments in order to reduce the risk of insolvency to future beneficiaries.

22. Since 1974, however, such cuts were categorically and unambiguously prohibited by federal law.

23. Even aside from federal statutory law, pension recipients had a right to prevent any cuts to their vested pension payments. The Takings Clause prevents the government from voiding this right, for its own benefit or otherwise, without paying fair compensation. That bar resembles the prohibition on allowing the government to enrich a specific insurance company by permitting it to withhold payouts that it owes to insured parties.

24. MPRA established a system that, as interpreted and applied by the U.S. government, was outright unlawful or, in the alternative, interfered with plaintiffs' right in a manner that amounted to an uncompensated taking.

25. In addition, MPRA caused other constitutional violations and statutory violations not relevant to this litigation.

26. MPRA provides that trustees of a multiemployer plan could apply to the Department of the Treasury to reduce pension benefits, and that such cuts could take effect following various procedures.

27. To cut vested pension benefits under Kline-Miller, six central steps need to occur. First, a pension plan needs to certify that its finances are in "critical and declining status." 29 U.S.C. § 1085.

28. Second, the plan needs to submit an application that, among other elements, specifies the size of the proposed cuts and to show that the cuts, in a fair manner, will stabilize the plan's finances.

29. Third, the Secretary of Treasury must review the application in coordination with the Department of Labor and the PBGC.

30. Fourth, if the application is approved by the Secretary of the Treasury, a vote must take place—akin to bankruptcy creditors voting to approve a Chapter 11 Plan—in which participants in the plan vote whether to approve the proposed cuts. Kline-Miller specifies that the cuts cannot proceed without approval of participants.

31. Fifth, Treasury must notify plan administrators of the outcome of the election and approve the plan under either of two specific sections of the U.S. Code.

32. Sixth and finally, if and only if Treasury approves the cuts, the cuts take effect.

33. As discussed below, some of those procedures were followed properly in the process that resulted in reducing plaintiffs' pensions. Others were not.

34. In August 2016, the Fund applied for approval from Treasury to cut payments of vested pension benefits. Without such authorization, the Fund was precluded by its own documents and by ERISA's "anti-cutback" rule from cutting vested pensions.

35. The Fund withdrew its application on or around April 5, 2017.

36. On May 15, 2017, the Fund submitted a revised application to Treasury to cut vested pension benefits.

37. The Fund reported to Treasury that it was in critical and declining condition.

38. The application sought to cut vested pension payments to most retired workers by 29%.

39. For "active" workers, however, the cuts proposed by the Plan's application were lower— 18% rather than 29%. Thus the cuts that retirees received were more than 50% higher than those that active workers received. The cuts therefore failed MPRA's fairness. Treasury did not undertake a meaningful assessment of the fairness of the proposed cuts, in spite of being legally required to do so.

40. For a subset of retirees (i.e., individuals above the age of 80 or who were disabled), no pension cuts would occur.

41. For another subset of retirees (i.e., individuals between the age of 75 and 80), pension cuts below 29% would occur. A sliding scale would apply.

42. These nuances were not proposed by Treasury or any other agency or instrumentality of the U.S. government. Rather, MPRA and Treasury enabled the Plan to decide how much to cut and how to apportion those cuts among various stakeholders. Thus, Treasury delegated to a private party decisions about how to reduce another's party's legal and economic rights.

43. Unsurprisingly, the Plan's proposal—later approved by Treasury—was a form of rent-seeking between the active workers and the employers who participate in the plan: they optimized the plan for themselves at the expense of retired workers who suffered larger cuts—29% versus 18%.

44. The details of the plan were primarily settled by a working group comprising representatives of active workers and representatives of employers. Retired workers had token representation incapable of influencing the outcome of those talks and no permanent representation on the Fund's board.

45. The Fund's application was provisionally approved by the Department of Treasury on or around July 17, 2017.

46. Treasury decided to allow that provisional vote.

47. Other agencies were consulted in Treasury's reaching that decision.

48. In the alternative, no other agencies were consulted in reaching that decision.

49. Under MPRA's procedures, however, that provisional approval had no effect without a vote of Plan participants who needed to approve the cuts. Thus, as required by MPRA, Treasury called a vote of plan participants to seek their approval for implementing the cuts. This approval process—in addition to the quirks discussed below—occurred very quickly, impairing the ability of Plaintiffs and other members of the proposed class from raising concerns about the cuts with Treasury or from blocking the cuts.

50. Treasury reports that it or an approved party sent ballots to roughly 34,000 participants in the Plan.

51. Approximately 14,000 participants voted.

52. The participants who voted rejected the proposed cuts overwhelmingly.

53. Of those who voted, 70.6% opposed the cuts, and only 29.4% approved the cuts.

54. In spite of the more than 2-to-1 margin by which voting participants opposed the cuts, Treasury treated the proposal to cut benefits as having passed.

55. In all, 9,788 participants voted against the reduction. Another 4,081 participants voted for the reduction. Another 20,767 ballots were allegedly delivered but not cast. Treasury treated the vote as succeeding by a 71.7%-to-28.3% margin (i.e., 24,848 to 9,788) rather than as failing by a 70.6% to 29.4% margin. It achieved this result by counting all of the non-votes as votes in favor of the cuts.

56. This approach conflicted with Treasury's own prior interpretation of the law. Specifically, on January 27, 2017, Treasury notified the Iron Workers Local 17 Pension Fund of the results of a vote regarding a proposal to reduce pension benefits. The letter stated, "[a] majority of eligible voters did not vote to reject your benefit suspension. Of the 936 votes *cast*, 616 voted in favor of the benefit suspension, and 320 voted against the benefit suspension. Accordingly, the letter serves as final authorization to suspend benefits . . . ." (Emphasis added).

57. In other words, on at least one occasion, Treasury previously assessed the outcome based on the number of ballots cast not the number of ballots *sent*.

58. Even though a supermajority of voting participants opposed the cuts, an official within the Department of the Treasury sent a letter to the Fund on or around September 13, 2017, authorizing the Fund to cut pensions beginning on October 1, 2017.

59. The letter reported that participants in the Fund would receive a "reduction in benefits," effective October 1, 2017. The cuts were, as noted above, 29% for nearly all retired workers whose pensions were fully vested. The same cut (29%) applied to beneficiaries of deceased

workers and workers who were not actively working for an employer sponsor but who were not yet old enough to receive their pensions.

60. Treasury's letter specified that the Secretary was authorizing the Fund to cut benefits related to Section 432(e)(9) of the Internal Revenue Code. That language and the statute on which Treasury relied is highly relevant: federal law prohibits cuts to vested pensions based on Section 432(e)(9). *See* 29 U.S.C. § 1054(g)(1) and MPRA does not create an exception to that rule. Treasury proceeded under the wrong statute. By relying on Section 432(e)(9) of the Internal Revenue Code rather than one of the two provisions under which vested benefits may *lawfully* be cut, Treasury acted without legal authority.

61. The pension cuts took effect on or around October 1, 2017, the first month in which a taking of Plaintiffs' property occurred.

62. Retired workers are often impaired from replacing their lost income by the physical demands of the jobs they once performed, the difficulty of regaining their position, and their health.

63. The actions of Treasury, described above were unlawful, arbitrary and capricious, and contrary to law: those actions include (i) treating the vote as having passed by majority vote even though more than 70% of pensioners opposed the cuts, (ii) failing to follow the procedures of MPRA, and (iii) relying on an impermissible statute to authorize the cuts. The cuts thereby were *ultra vires*.

64. Each Plaintiff suffered an unlawful seizure of their property in October 2017, and on or around the first day of each subsequent month.

65. In October 2017 and each month since then, Plaintiffs and all members of the proposed class received a pension payment that was either 29% lower than all of their earlier guaranteed and non-reducible pension payments or, if they were above age 75, more than 0% but less than

29%. (The Complaint also asserts an alternative class definition: for this alternative class,

Plaintiffs and all members of the proposed class received cuts to their vested pensions of

exactly 29%.)

66. Even if the cuts were lawful, they were nevertheless a taking of plaintiffs' property for which

they are entitled to compensation.

## CLASS ACTION ALLEGATIONS

67. This lawsuit seeks to certify both (1) a Damages Class and (2) an Injunction Class.

68. Plaintiff Linda Leather is the class representative for the proposed Damages Class. She

worked for many years at the Auburn Cable Company. She lost approximately $80 per

month as a result of the 29% cuts. She has experienced this reduction each month since the

cuts took effect. She left her home and moved into a modest duplex with her son to lower her

living costs. This change was directly attributable to the pension cuts.

69. Her economic damages are less than $10,000. In the alternative, she is willing to "cap" her

damages at $10,000 in order to afford this Court jurisdiction over her claims.

70. Ms. Leather seeks compensation on behalf of herself and all other similarly situated through

an opt-out class action. The definition of that putative class appears later in this Complaint.

This class excludes the Taking Clause claims of those who opt-in to the putative class action

pending in the Court of Federal Claims.

71. She seeks to certify an "opt-out" class of:

> all individuals (excluding active employees in companies that are Plan participants)
> for whom the following is true:
> 1. his or her vested monthly pension from the New York State Teamsters
>    Conference Pension & Retirement Fund was reduced on or after October 1, 2017
> 2. his or her total loses are either
>    a. less than $10,000 in value or

     b.  greater than $10,000 but did not opt-in to the pending lawsuit in the Court of Federal Claims related to the same dispute (*see King et al. v. United States*, Case No.: 1:18—cv—01115—NBF).

72. In the alternative, Leather seeks to certify the following "opt-out" class:

> all individuals (excluding active employees in companies that are plan participants) for whom the following is true:
>
> 1. his or her vested monthly pension from the New York State Teamsters Conference Pension & Retirement Fund was reduced **by 29%** on or after October 1, 2017
> 2. his or her total loses are either
>     a. less than $10,000 in value or
>     b. greater than $10,000 but did not opt-in to the pending lawsuit in the Court of Federal Claims related to the same dispute (*see King et al. v. United States*, Case No.: 1:18—cv—01115—NBF).

73.  Plaintiff Leather further asks the Court to modify this class definition—by sub-classes, information learned during discovery, and the Court's good judgment and commitment to producing a just result—as needed.

74. Ms. Leather and the three other named plaintiffs ask this Court to certify a second class, too—an Injunction Class (though the class is flexible in terms of the type or types of equitable relief it seeks).

75. Plaintiffs King, Dardzinski, and Gugliuzza are named plaintiffs in the lawsuit for damages pending in the Court of Federal Claims.  Along with Plaintiff Leather, they seek injunctive and other equitable relief in this case on behalf of a class. They seek to represent an opt-out class seeking a permanent injunction or order barring Treasury from enforcing MPRA, an order requiring Treasury to rescind the approval it gave to Plaintiff's pension plan to reduce pension payments, and a declaratory judgment that the government's actions are unlawful and that its interpretation of MPRA violates the Administrative Procedures Act.

76. Plaintiff Bill King is 70 years old. For approximately thirty years, King worked exclusively for UPS, except from 1999 to 2001 during which he worked for the union itself. He drove

trucks, loaded trucks, unloaded trucks, performed air recovery, and completed other obligations.

77. ERISA's anti-cutback rule was in effect at all times that King worked for UPS. It was in effect until a decade after he retired.

78. The pension became increasingly important to King as he grew older. He was offered, in or around 1983, an opportunity to serve as Transportation Director for the West Genesee school district. He declined the position largely because of the guaranteed pension that he was earning by working at UPS. King refrained from looking for jobs during his time as a UPS employee largely because of the pension guarantee. Over time, the pension became the dominant reason that King stayed in his job rather than looking for another position with a higher salary.

79. King believed what he was told by individuals at the pension fund and his employer: the pension was, in King's paraphrasing of what he understood based on those discussions, "the amount you get for life."

80. King's work was, for the vast majority of his career as a UPS employee, physically demanding. King obtained his license to drive trucks because, while still in his thirties, he began experiencing knee pain. King was committed to showing up to work even when he was sick because he did not want to risk his pension benefits or delay the time when he would begin receiving them. He noticed colleagues behaving in the same way.

81. In 2002, King returned to physical work rather than a desk job, and he continued that role until he retired in mid-2008.

82. King began receiving pension payments in 2008. His pension has been both fully vested and paid since then—and has been uncuttable since then. Before retiring, he confirmed with the

Plan that his pension would be fully guaranteed and could not be reduced. He relied on these representations.

83. Before joining UPS in December 1988, Plaintiff Stephen Dardzinski, now aged 69, had a job without a pension. He left that job to work at UPS because obtaining a pension was critical to him. He worked for UPS as a mechanic before retiring in 2011. At UPS, he worked the night-shift and was often unable to take vacations before the Christmas holidays, whereas his previous job (the one without a pension) enabled him to be home by 5:30 PM on nearly all nights and did not restrict his vacations. The change in hours and in the physical demands of the work—the job at UPS was far more taxing—had serious consequences for Dardzinski's health and his relationship with his family. He was willing to make these sacrifices in exchange for the pension he was earning.

84. Dardzinski will testify that, during his time working for UPS, it was common knowledge that once a retired employee started collecting pension benefits, those benefits could not be cut unless the fund had failed. UPS emphasized proudly that the pension plan was a compelling reason to join UPS or to stay at UPS. Further, Fund documents provided to Dardzinski specifically stated that his pension could not be cut and was guaranteed. As UPS suggested, Dardzinski emphasized these pension benefits to his family whenever he had discussions with them about the stress and extraordinary time commitments of his job. In taking the job at UPS, remaining at UPS, and retiring when he did, Dardzinski relied on these representations. Because of the importance to Dardzinski of the UPS-related pension benefits he was earning and the legal protections they had, Dardzinski did not entertain other job opportunities while working at UPS.

85. Plaintiff Anthony Gugliuzza began working at UPS in or around 1971. He retired in or around 2001. He became aware during his time at UPS that his pension was guaranteed by federal law. He has been ill in recent months and is not in good enough health to work. He has suffered from depression. His wife has needed to take a part-time job to help the family make ends meet. In Gugliuzza's words the cuts are "hurting me bad."

86. When Plaintiffs (including, in this paragraph and those below, Plaintiff Leather) took or continued in their jobs, they relied on the guarantees against vested pensions being cut.

87. When Plaintiffs decided to stay in their jobs, they relied on the guarantees against vested pensions being cut.

88. Plaintiffs relied on written representations from officials at their employer or the Plan, or both, that a vested pension could not be cut.

89. Plaintiffs relied on oral representations from officials at their employer or the Plan, or both, that a vested pension could not be cut.

90. Plaintiffs invested in their pensions with their labor: they stayed at their jobs, refrained from exploring other possibilities, and/or declined other professional opportunities in material part because of the guarantee of a secure, uncuttable pension. They each expected that they would receive the full sum of the pension. If the pension could not be paid indefinitely, they expected that they would receive payments until the Fund was depleted, at which point they would receive guaranteed payments from the Pension Benefit Guaranty Corporation.

91. During the vote on the proposed cuts, Plaintiffs cast timely ballots against the cuts.

92. Beginning on or around October 1, 2017, the monthly pension payment that each Plaintiff received was reduced by 29%.

15

93. The cuts were inconsistent with their past experience. Vested benefits had not been cut at any time during their careers. Until years after Plaintiffs retired, cuts of vested benefits were prohibited by federal law barring plan insolvency.

94. The reduction in pension payments that Treasury authorized involved cutting benefits of theirs that were fully vested.

95. Money that has been paid into the Fund is managed by and invested by the Fund for the benefit of Plaintiffs and the proposed class, among others. That money is not merely some vague future promise. There is actual money—over one billion dollars—sitting in actual accounts, and that money is held, invested, and administered by the Fund for the benefit of Plan participants.

96. Plaintiffs have faced significant economic harm from the cuts.

97. Plaintiffs seek to certify an injunction class under Rule 23 of this Court's rules defined as follows, but as modified by sub-classes, information learned during discovery, and the Court's good judgment and commitment to producing a just result:

> all individuals (excluding active employees in companies that are plan participants and individuals over the age of 80 at the time of the cuts) whose vested monthly pension from the New York State Teamsters Conference Pension & Retirement Fund was reduced on or after October 1, 2017.

98. For both the proposed Damages Class and Injunction Class, the term "monthly pension" is intended to refer to any pension that was vested or protected by ERISA's anti-cutback rule, or both, at any time during the individual's work for a company that participated in the Plan.

99. No person participating in the damages lawsuit in the Court of Federal Claims would be seeking damages in this case.

100. Subject to that excluded group, both of the proposed classes include, among other class members, participants in the Plan whose pensions were cut by 29%; and beneficiaries (which

generally refers to surviving spouses of Plan participants) whose pensions were cut by 29%; and any other individuals whose pensions from the Plan were cut by 29%, whether or not they had begun receiving pension payments from the Plan as of October 1, 2017 (e.g., people who quit their union job and who have a vested pension with the Plan but had not yet begun collecting it as of October 1, 2017).

101.   Both of the proposed classes include, among other members of the classes, all retired individuals who were, as of October 1, 2017 (or such other date as used by the Plan in imposing cuts) between 75 and 80 years old and received a pension cut of more than 0% but less than 29%.

102.   Both of the proposed classes exclude "active workers" whose pensions were cut by 18%.

103.   Both of the proposed classes exclude plan participants age 80 or older at the time the cuts took effect (because they did not experience a cut and therefore did not experience an economic injury from the Defendant's actions).

104.   Plaintiffs respectfully ask the Court to use case management techniques, including sub-classes and class narrowing or refining of the above wording to produce a class for damages and another for injunctive relief that, even if it is not identical to the definitions provided above, produces a just result.

105.   As of 2017, approximately 35,150 men and women participate in the Fund, the majority of whom fit into the above class definitions. Based on the information filed by the Fund, the classes would each comprise approximately 21,250 plan participants (minus, for the Damages Class, however many people opt to participate instead in the litigation in the Court of Federal Claims). The classes would each be several thousand people smaller if the alternative definition were used.

106.    All of the members of the proposed classes face common questions and issues: (1) they

earned a pension that vested, (2) believed that the pension was guaranteed or would have so

believed if they had researched ERISA's anti-cutback rule or Plan documents, (3) worked for

a majority of their time as an employee of an Employer Sponsor of the Fund during an era

when, under federal law (ERISA's anti-cutback rule), their pension benefit could not be

reduced, (4) can reasonably be assumed to have taken the job because of, stayed at the job

because of, or refrained from looking for other professional opportunities and/or retired when

they did at least in significant part because of the pension benefit, (5) had their pension

lowered in the wake of and because of Treasury's decision to approve cuts, (6) they were

harmed by Treasury's actions in a manner that requires damages, equitable relief, or both to

effect a proper remedy, or (7) some combination of the considerations just mentioned

sufficient to create commonality.

107.    In the alternative to the commonalities just mentioned (but in addition to the central

question of whether a taking occurred), the members of the proposed classes have issues in

common with one another because their pension was cut on exactly the same day and

authorized by exactly the same division of the U.S. government following exactly the same

procedures as to all members of each putative class.

108.    For the alternative class definition for each of the two putative classes, each member of

each proposed class had his or her pension cut by exactly the same amount, too, each month

(i.e., 29%) in addition to the common issues just mentioned.

109.    The claims of Plaintiff Leather are typical of the claims of the proposed Damages Class

insofar as she had a vested pension that she worked many years to earn and which she

believed could not be cut.

110.    The claims of all four Plaintiffs are typical of the proposed Injunctive Class. They

worked for multiple decades during which vested pensions could not be cut. Each of them

had his pension cut because of the government's actions. The government action, for all the

proposed class members, either was or was not an illegal, was or was not contrary to

MPRA's plain terms, was or was not an impermissible delegation of authority to the Plan,

and so on. Moreover, for the vast majority of the proposed class, their pension was cut by

exactly 29%. For those between ages 75 and 80, their claims can be resolved through a sub-

class, or the court could certify a class only for individuals whose pensions were cut by 29%,

though that would likely leave those men and women between the ages of 75 and 80 without

relief—though the exact amount of the cuts matters even less for the Injunctive Class than for

the Damages Class.

111.    The representative plaintiffs will work vigorously to advance the interests of all members

of the proposed classes. They were chosen by counsel because they are fair, knowledgeable,

trusted by their peers, and committed to resolving this issue.

112.    The defendant has acted on grounds that apply to the entire proposed classes. In

particular, it protected its own financial interests (by shielding the Pension Benefit Guaranty

Corporation from needing to pay claims) by cutting vested pensions of members of the

proposed classes, and engaged in an uncompensated taking in the process.

113.    As for all facts stated herein, the defendant is liable, responsible, and accountable for the

actions taken by its agencies, including the Department of the Treasury, either in all instances

or, at a minimum, for purposes of the facts alleged in this Complaint.

114.    Aside from a class action, no practicable way exists to compensate the men and women

who were harmed by Defendant's actions.

115.    For the injunctive class, classwide relief ensures that any equitable remedy or order will

apply to all members of the proposed class.

116.    The issues for which the proposed damages class seeks a remedy predominate—in fact,

they completely dominate. As noted above, every class-member in the damages class will

have an identical or nearly identical legal question located at the heart of their claim: did the

government owe them just compensation for cutting their pension benefits?

117.    For the injunctive class, too, several legal questions dominate: is MPRA constitutional

either facially or as applied by permitting the Plan to propose the specific cuts, did Treasury

implement the statute in a manner that violated the Administrative Procedure Act by

disregarding the vote of a supermajority of voting Plan participants, did Treasury act *ultra*

*vires* by relying on a statute that MPRA does not permit it to act under, and did Treasury fail

to follow the procedures specified by MPRA?

118.    Numerous other facts also predominate, as noted above.

## CLAIMS FOR RELIEF

**Claim 1: Constitutional Claim (*Ultra Vires* Authorization of Seizure of Plaintiffs' Property)**

119.    Plaintiff Leather, on behalf of herself and the proposed Damages Class, incorporate by

reference and re-allege each and every allegation contained in Paragraphs 1-118 as though

fully set forth herein.

120.    Plaintiff Leather, on behalf of herself and the proposed Damages Class, allege that the

Defendant acted illegally when they authorized another party, the pension plan, to withhold

up to 29% of their monthly pension income without a legal basis for doing so.

121.    Plaintiff Leather, on behalf of herself and the proposed Damages Class, seeks damages

up to $10,000 per person from Defendant equal to the total sum by which each Plaintiff's and

each class-member's pension payment has been reduced.

### Claim 2: Constitutional Claim (Damages for Due Process Violations Under Fifth and Fourteenth Amendments)

122.　Plaintiff Leather, on behalf of herself and the proposed Damages Class, incorporate by reference and reallege each and every allegation contained in Paragraphs 1-121 as though fully set forth herein.

123.　Plaintiff Leather, on behalf of herself and the proposed Damages Class, allege that the Defendant violated their due process rights, resulting in a deprivation of plaintiff's property, an impairment of their legal rights, a reduction in the value of their property, and a reduced likelihood of obtaining insurance benefits from the Pension Benefit Guarantee Corporation. Plaintiffs, on behalf of themselves and the proposed class, seek damages from the U.S. government equal to the amount by which each Plaintiff's and each class-member's pension was reduced or such other amount as reflects, in accordance with the due process protections in the Fifth and Fourteenth Amendments, just compensation.

124.　Plaintiffs and members of the proposed class meet the requirements of *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), other cases about pensions, and the inherent rights established by the Fifth Amendment to receive just compensation for the government's actions.

## Claim 3: Constitutional Claim (Takings Clause)

125.    Plaintiff Leather, on behalf of herself and the proposed Damages Class, incorporate by

reference and re-allege each and every allegation contained in Paragraphs 1-124 as though

fully set forth herein.

126.    Plaintiff Leather, on behalf of herself and the proposed Damages Class, allege that the

Defendant acted illegally when they authorized another party, the pension plan, to withhold

up to 29% of their monthly pension income without a legal basis for doing so without paying

just compensation: that is true even if MPRA is legal and  Treasury's actions in

implementing MPRA were permissible.

127.    Plaintiff Leather, on behalf of herself and the proposed Damages Class, seeks damages

up to $10,000 per person from Defendant equal to the total sum by which each Plaintiff's and

each class-member's pension payment has been reduced.

## Claim 4: Due Process Clause (Equitable Claims)

128.    Plaintiffs, on behalf of themselves and the proposed class, incorporate by reference and

re-allege each and every allegation contained in Paragraphs 1-127 as though fully set forth

herein.

129.    Plaintiffs seek a declaratory judgment or other appropriate equitable relief (such as an

injunction or an order that Treasury rescind its authorization of the Plan to cut benefits) that

based on the facts asserted in this Complaint the Defendant has acted unlawfully and beyond

its constitutional powers.

## Claim 5: Non-Delegation Doctrine

130.   Plaintiffs, on behalf of themselves and the proposed class, incorporate by reference and re-allege each and every allegation contained in Paragraphs 1-129 as though fully set forth herein.

131.   MPRA violates the non-delegation doctrine, which prohibits Congress from delegating governmental functions to private parties. MPRA violates the non-delegation doctrine by enabling one private party (the Plan) to decide how much to cut the amount that it will pay other private parties (the Plaintiffs). The non-delegation doctrine requires the government to more than rubber-stamp a private party's proposal to reduce its financial obligations in accordance with its own wishes. Either an adversarial hearing is required or a process that allows meaningful notice and comment. The process that occurred is akin to letting an insurance company decide how much to reduce its payouts or allowing a financial firm to decide how much to reduce the annuity payments it owes to private parties. If the government wishes to act, it must act. It cannot delegate to a large, wealthy institution the decision about how much to enrich itself and then sign off on that decision through a cursory review process. And as shown in the facts above, that is what MPRA envisions—and what it requires.

132.   MPRA therefore violates and is void under the non-delegation doctrine.

**Claim 6:  Administrative Procedure Act, 5 U.S.C. § 500 et seq.**

133.   Plaintiffs, on behalf of themselves and the proposed Injunction Class, incorporate by reference and re-allege each and every allegation contained in Paragraphs 1-132 as though fully set forth herein.

134.   By not properly conferring with other agencies, by disregarding that a supermajority— more than 70%—of voting Plan participants opposed the cuts, by purporting to act under a

statute that MPRA does not permit Treasury to act under, and/or the other facts alleged in this Complaint, Treasury acted arbitrarily and capriciously and in violation of the Administrative Procedure Act.

135.   The above claims apply to the alternative-class if the proposed class is found not to be suitable for certification.

**Claim 7: Administrative Procedure Act, 5 U.S.C. § 500 et seq. (Violation of MPRA)**

136.   Plaintiffs, on behalf of themselves and the proposed class, incorporate by reference and re-allege each and every allegation contained in Paragraphs 1-135 as though fully set forth herein.

137.   Even if MPRA is lawful, it prohibits any pension cuts unless those cuts and fair and equitable. But Treasury approved cuts that at more than 50% higher for retired workers than for active workers—29% versus 18%. There is only one reason for these inequitable cuts: active workers had significant representation in the negotiations within the Plan about how to cut pension benefits. By contrary, retired workers had a single, token representative.

138.   Treasury did not consider whether the cuts were equitable.

139.   In the alternative, Treasury acted arbitrarily and capriciously, and contrary to law (including MPRA's plain terms) in approving cuts to the benefits of retired workers that were so obviously inequitable.

**Claim 8: Violation of MPRA's Enabling Legislation**

140.   Plaintiffs, on behalf of themselves and the proposed class, incorporate by reference and re-allege each and every allegation contained in Paragraphs 1-139 as though fully set forth herein.

141.    Even if MPRA is valid, it prohibits any pension cuts unless those cuts and fair and

equitable. But Treasury approved cuts that at more than 50% higher for retired workers than

for active workers—29% versus 18%. MPRA does not permit pension cuts if a majority of

plan participants vote against the cuts. Over seventy percent of voting plan participants voted

against the cuts, yet Treasury approved the proposed cuts. MPRA permits cuts under only

two statutes; Treasury approved cuts under an unrelated statutory provision. Thus, even aside

and apart from any APA issues, Treasury has thereby violated MPRA's implementing

legislation.

**Claim 9: Violation of Administrative Procedure Act (Authorization of Cuts by Official**

**Other than Secretary of the Treasury)**

142.    Plaintiffs, on behalf of themselves and the proposed class, incorporate by reference and

re-allege each and every allegation contained in Paragraphs 1-141 as though fully set forth

herein.

143.    MPRA requires the Secretary of the Treasury to approve and authorize any cuts. The

Secretary of the Treasury did not approve the cuts that harmed Plaintiffs. The cuts were

instead approved by a lower-level official at Treasury.

144.    On information and belief, the official was not even confirmed by the Senate.

145.    This action is arbitrary and capricious, contrary to law, contrary to the APA and MPRA's

plain terms.

**Prayer for Relief**

WHEREFORE, Plaintiffs demand judgment in their favor, and in favor of the Class, against

Defendant United States of America as follows, on behalf of themselves and all others

similarly situated. They seek orders as follows:

A.  certifying an appropriate Class and/or Subclasses for a Damages Class

B.  designating  Plaintiff Leather as  Class  Representatives for the Damages Class

C.  designating her counsel of record as Class Counsel;

D.  certifying an appropriate Class and/or Subclasses for an Injunction Class to afford members of that Class or Subclass(es) with appropriate equitable relief comprising an injunction, declaratory judgment, order, or other non-economic remedies, including, if the Fund is impleaded, an order to issue "backpay" to members of the Injunction Class;

E.  designating Plaintiffs as Class Representatives for the Injunction Class

F.  designating their counsel of record as Class Counsel;

G.  finding and deciding that Defendant has illegally exacted the property of Plaintiff Leather and the members of the proposed Damages Class;

H.  finding and deciding that Defendant has unlawfully taken the property of Plaintiff Leather and the members of the proposed Damages Class;

I.  determining and awarding to Plaintiff Leather and members of the proposed Damages Class fair compensation for the damages sustained to them as a result of any and all the violations by Defendant of such rights as are mentioned elsewhere in this Prayer for Relief (not to exceed $10,000 per person), above;

J.  Awarding to Plaintiffs and members of the proposed class the costs and disbursements of this action, including reasonable attorney's fees and experts' fees, costs, and expenses;

K.  Awarding and adding to any judgment, pre-judgment, and post-judgment interest, together with any and all further costs, disbursements, and reasonable attorney's and expert's fees;

L.  Issuing a declaratory judgment, order, or other equitable remedy requiring Defendant to pay, prospectively, an appropriate amount to Plaintiffs and members of the proposed class if Defendant elects not to rescind the approval for the Fund to pay reduced pension payments to Plaintiffs and members of the proposed class.

Dated:   September 28, 2018

By:      /s Phillip M. Spector
Phillip M. Spector
 (D.C. Bar No. 479121)
Attorney of Record
MESSING & SPECTOR LLP
1200 Steuart Street #2112
Baltimore, MD 21230
Tel. (202) 277-8173
Email: ps@messingspector.com

Noah A. Messing (motion for admission *pro hac vice* pending)
MESSING & SPECTOR LLP
333 E. 43rd St.
Lobby 1
New York, NY 10017
Tel. (212) 960-3720
Email: nm@messingspector.com